IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

PATRICIA A WESTMORE and DWIGHT R.
WESTMORE,

|  |  |  |
|---|---|---|
| | Plaintiffs, | OPINION AND ORDER |
| v. | | 14-cv-861-wmc |

DAVID HYDE, CALLAE K. HYDE,
SHERIFF MICHAEL W. BRENNAN,
DEPUTY TERRI L. PROVOST, and
ASHLAND COUNTY, WISCONSIN

Defendants.

---

On December 12, 2014, plaintiffs Patricia and Dwight Westmore filed this lawsuit following a search of their property and the seizure of several of their animals by various officials of Ashland County, Wisconsin. Before the court is defendants' motion for summary judgment (dkt. #17), which will be granted in part and denied in part for the reasons that follow.

## MOTION TO STRIKE

As a preliminary matter, plaintiffs move to strike several affidavits and exhibits prepared by four of defendants' expert witnesses (Szenay, Jahnke, Callae Hyde and David Hyde) in support of the motion for summary judgment. (Dkt. #53.) Plaintiffs argue that defendants improperly classified those witnesses as experts under Federal Rule of Civil Procedure 26(a)(2)(C), who were not required to provide a written report, thereby prejudicing plaintiffs' ability to respond to their subsequent affidavits and exhibits in support of defendants' motion for summary judgment. In addition to contending that their expert disclosures satisfied any Rule 26 obligation, defendants

argue that they should not be faulted for plaintiffs' failure to notice depositions for Szenay and Jahnke further in advance of their deadline to respond to defendants' motion for summary judgment.

Among other things, Rule 26(a)(2)(B) requires a party to provide a timely, detailed written report "if the witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony."  In particular, the report "must contain":

> (i) a complete statement of all opinions the witness will express and the basis and reasons for them;
>
> (ii) the facts or data considered by the witness in forming them;
>
> (iii) any exhibits that will be used to summarize or support them;
>
> (iv) the witness's qualifications, including a list of all publications authored in the previous 10 years;
>
> (v) a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and
>
> (vi) a statement of the compensation to be paid for the study and testimony in the case.

Fed. R. Civ. P. 26(a)(2)(B).  In contrast, "if the witness is not required to provide a written report," the party need only disclose:

> (i) the subject matter on which the witness is expected to present evidence under Federal Rule of Evidence 702, 703, or 705; and
>
> (ii) a summary of the facts and opinions to which the witness is expected to testify.

Fed. R. Civ. P. 26(a)(2)(C).

Defendants served their Rule 26(a)(2) expert disclosures on October 30, 2015, the deadline established in the pretrial conference order.  Their four-page disclosure identifies eight, individual experts, including Szenay, Jahnke, Callae Hyde and David Hyde, noting that none of the listed witnesses were expected to receive "compensation" for their testimony.  The report also summarizes the topics about which Szenay and Jahnke were expected to testify, including animal cruelty investigations generally and the conditions of plaintiffs' animals.  The report further indicates that Callae Hyde and David Hyde were expected to testify about various other topics, including protocols followed by humane officers in Wisconsin and training regarding the removal of animals under Wis. Stat. § 173, respectively.

Plaintiffs do not dispute that defendants' expert disclosures would satisfy the requirements of Federal Rule of Civil Procedure 26(a)(2)(C) if the experts were not Rule 26(a)(2)(B) witnesses "retained or specially employed to provide expert testimony in the case."  They argue that defendants should have designated the four experts under Rule 26(a)(2)(B) because their affidavits and exhibits "consist largely of independent veterinary medical opinion evidence, and technical humane officer opinion evidence" (Pls.' Opening Br. (dkt. #55) at 12), but this argument misses the mark.  Defendants obviously concede that the affidavits and exhibits contain expert opinion testimony, which is why defendants disclosed each of the four experts as Rule 26(a)(2)(C) witnesses by the deadline established by the court.

The central question is neither whether defendants' experts will receive compensation for their testimony, nor whether the affidavits and exhibits contain expert opinions, but rather whether the experts are principally rendering opinions of a type and

in a manner warranting greater disclosure under 26(a)(2)(B).  Here, plaintiffs have failed to show that Callae and David Hyde are expert witnesses for whom a detailed, written report is required for several reasons.  First, they are full time employees of defendant Ashland County, who do not regularly give expert opinion testimony.  The advisory committee notes to the 2010 amendment of Rule 26 specifically identify such employees as "[f]requent examples" of Rule 26(a)(2)(C) witnesses who may provide both fact and expert testimony.  Second, plaintiffs point to nothing in this record suggesting that despite the Hydes being named defendants, central fact witnesses and the type of employees who are frequently named Rule 26(a)(2)(C) experts, they have nevertheless been "retained or specially employed" to provide opinion testimony.  *Cf. Downey v. Bob's Discount Furniture Holdings, Inc.*, 633 F.3d 1, 6 (1st Cir. 2011) ("In order to give the phrase 'retained or specially employed' any real meaning, a court must acknowledge the difference between a percipient witness who happens to be an expert and an expert who without prior knowledge of the facts giving rise to litigation is recruited to provide expert opinion testimony.").[1]

Whether Szenay and Jahnke are properly characterized as Rule 26(a)(2)(C) experts is a closer question.  On one hand, since both veterinarians examined the health of plaintiffs' animals for the purpose of determining whether they should be put down or taken away from plaintiffs, they would ordinarily qualify as treating physicians for whom a written report is not required.  *See* Fed. R. Civ. P. 26, Advisory Committee Notes, 2010

---

[1] Even if the court were to analyze the nature of the Hydes' opinion testimony for further clues, plaintiffs have not shown that they will be called solely or even principally to offer expert opinion testimony.  *Cf. Prieto v. Malgor*, 361 F.3d 1313, 1318 (11th Cir. 2004) (collecting cases discussing whether "hybrid witnesses" testifying about both factual and expert matters were "called solely or principally to offer expert testimony").

Amendment (identifying "physicians or other health care professionals" as "[f]requent examples" of Rule 26(a)(2)(C) experts). On the other hand, plaintiffs have come forward with sufficient evidence to at least raise a suspicion that Szenay and Jahnke have been "retained or specially employed" to provide additional expert testimony in this case. Both admit in supplemental affidavits that they did not formalize their reports until February or March 2014, weeks after they examined plaintiffs' animals in December 2013, *and* more importantly to plaintiffs' motion to strike, after the prospect of litigation between the parties had become substantially more likely. *Cf. EEOC v. AutoZone, Inc.*, 707 F.3d 824, 833 (7th Cir. 2013) ("[A] treating physician can provide an expert opinion without submitting a written report if the physician's opinion was formed during the course of the physician's treatment, and not in preparation for litigation.").

That being said, plaintiffs do not demonstrate that defendants formally retained Szenay and Jahnke to provide expert testimony in this case, nor more importantly that their affidavits and exhibits reflect opinions formed in preparation of litigation, as opposed to their first-hand observations and opinions about the health of plaintiffs' animals at the time of their original inspections. *Cf. Eberhart v. Novartis Pharm. Corp.*, 867 F. Supp. 2d 1241, 1252-52 (N.D. Ga. 2011) ("[T]reating physicians who are not designated as experts may offer 'lay' testimony that implicates their specialized experience as a physician if the testimony is an account of their observations during the course of treatment or if it is offered for the purpose of explaining the physician's decision-making process or the treatment provided.") Indeed, although their reports were not prepared contemporaneously with their examination of plaintiffs' animals, nothing suggests that defendants asked Szenay and Jahnke to offer opinions beyond the

scope of their personal observations in the course of their examinations.  *See, e.g., Meyers v. Nat'l R.R. Passenger Corp.*, 619 F.3d 729, 734-35 (7th Cir. 2010) ("[A] treating physician who is offered to provide expert testimony as to [a particular issue], but who did not make that determination in the course of providing treatment, should be deemed one 'retained or specially employed to provide expert testimony in the case,' and thus is required to submit an expert report in accordance with Rule 26(a)(2).")  Accordingly, Szenay and Jahnke are also not 26(a)(2)(B) witnesses, and plaintiffs' motion to strike will be denied.[2]

## UNDISPUTED FACTS[3]

### I.  The Parties

Plaintiff Patricia A. Westmore is 72 years old and resides with her husband and fellow plaintiff, Dwight Westmore, in Butternut, Wisconsin.  The Westmores have owned horses and donkeys on their property for a number of years.

Defendant David Hyde resides in Washburn, Wisconsin, with his wife and fellow defendant, Callae Hyde.  At all times relevant to this lawsuit, Callae Hyde was the only Humane Officer appointed by Ashland County.  The parties dispute whether David Hyde had the legal authority of a Humane Officer during the events relevant to this lawsuit, but there is no dispute that he acted on behalf of defendant Ashland County.  Finally, defendant Michael Brennan is the Ashland County Sheriff, and defendant Terri Provost is a deputy sheriff with the Ashland County Sheriff's Department.

---

[2] Considering all the circumstances here, even if the court were to find that Szenay's and Jahnke's opinions had not been adequately disclosed under 26(a)(2)(C), the remedy would likely not be to strike their testimony, or even to strike affidavits at summary judgment, but rather to allow for additional discovery before having to respond.

[3] The following facts are material and undisputed, unless otherwise noted.

## II. Gina Benson's Complaint

On December 26, 2013, a member of a horse rescue organization, Gina Benson, called the Ashland County Sheriff's Dispatch Office to report neglect of a donkey and multiple horses at the Westmores' residence.  That same morning, David Hyde received a page informing him of Benson's report.  He then called his wife, Ashland County Humane Officer Callae Hyde, to share that information.

Since Callae was traveling outside of Wisconsin on December 26 and 27, 2013, she told David that she would contact the Ashland County Sheriff's Department and veterinarian Lesley Szenay, who had worked with Gina Benson and the horse rescue organization to which Benson belonged, and then call David back.  At some point on December 26, defendants claim that Callae spoke with Szenay, who indicated she was willing to examine plaintiffs' animals the following day.

When she called the Ashland County Sheriff's Department to discuss Benson's complaint, Callae spoke with Sheriff Michael Brennan.  After Callae explained the situation to him, including that David would be responsible for responding to Benson's complaint on behalf of Callae since she was traveling, Brennan advised them to "respond accordingly." At this point, it is undisputed that Brennan did not recommend that they obtain a warrant to search plaintiffs' property or seize their animals.

After speaking with Brennan, Callae then called David, telling him to contact Szenay and make arrangements to meet at plaintiffs' property the following morning.  During one of their phone conversations, Callae also told David that he should inform plaintiffs about Benson's complaint.  Consistent with Callae's direction, David did just that and more.

### III. David Hyde's Visit to the Property

The parties' accounts of David's interaction with plaintiffs on December 26 differ sharply.   Plaintiffs contend that David introduced himself as the "Ashland County Animal Control Officer," stating that he was there to look at their donkey.   According to plaintiffs, when they asked him why he wanted to look at their donkey, David explained that he had received a complaint about their animals.   Plaintiffs further assert that when they informed David that their donkey, Jethro, was being cared for by a veterinarian, he claimed to have the authority to see the donkey because of the complaint.   According to plaintiffs, Patricia Westmore again insisted that Jethro was being cared for properly, but reluctantly led David to the barn.   Plaintiffs also claim that Dwight Westmore asked David whether he had a warrant, to which he responded truthfully.   With no warrant, plaintiffs claim that Dwight then got upset and told David to leave the property.

In contrast, upon arriving at their property, defendants claim that David merely told the Westmores that he was "with animal control."   They further contend that plaintiffs voluntarily permitted him to look at their donkey and the horses.   Defendants also claim that Dwight or Patricia *never* asked David about a search warrant, nor did they ask him to leave their property.

### VI. Seizure of Animals

The parties generally disagree about the actual condition of the plaintiffs' animals on December 26, although plaintiffs agree that Jethro needed veterinary attention and that their horses had grown long hair to accommodate for the cold temperatures.   The

parties also dispute what David informed plaintiffs as he was leaving their property on December 26.

Plaintiffs claim that David said he would return with "a couple of" veterinarians to examine Jethro, but did not say when he planned to come back.  They also claim that David assured them the county would not be taking any horses.  According to plaintiffs, Patricia Westmore also insisted that David bring Jethro's primary veterinarian, Dr. Baum, and Patricia made clear that she didn't want him to bring Szenay under any circumstances.  In contrast, defendants assert that plaintiffs approved of David returning with two veterinarians the following day to inspect their animals.  Defendants acknowledge that Patricia initially voiced her concern about Szenay in particular, but consented to her coming with David as long as he promised to also bring along a second veterinarian.

The morning of December 27, 2013, David met with Deputy Sheriff Terri Provost near plaintiffs' property.  David and Provost spoke over the phone while en route to meet one another.   In an incident report dated December 27, 2013, Provost noted the following about their conversation:

> I asked Dave if they had a court order to remove the animals. Dave said they did not have a court order but the horses were in imminent danger as they were malnourished and with the cold weather coming they were not in a good way.  Dave said they may have to put the donkey down because it is inhumane as the donkey is suffering and its organs are shutting down.  They can't even get the donkey to stand anymore and its temperature is low.  I told Dave that I would meet him there.

(Defs.' Ex. A (dkt. 10-2) at ECF 3.)  Provost added in her report that "the owner is going to give the vet problems because when they were out there on Sunday Patricia told the

vet that she is not allowed on the property anymore." (*Id.*)  When David and Provost met before going to plaintiffs' property, he told her that they would likely take at least two horses and possibly euthanize Jethro.

At plaintiff's property, Provost introduced herself and announced that animal control was waiting on the veterinarians to examine the condition of their animals.  The parties again disagree about whether Dwight Westmore asked Provost whether she had a warrant.  Plaintiffs assert that Provost responded that they did not need a warrant to enter the property, but defendants contend that no such discussion took place.  More generally, plaintiffs contend that they never gave Provost, David Hyde, the veterinarians (or the individuals who assisted them in loading plaintiffs' horses onto trailers) permission to enter or remain on their property.  Plaintiffs claim that Provost and David gave those other individuals authorization to enter onto plaintiffs' property, even as Patricia demanded that Szenay and the other individuals leave.  Defendants dispute plaintiffs' account, asserting that -- with the exception of Gina Benson, who left when asked -- plaintiffs voluntarily allowed everyone to enter onto their property *and* at no time demanded that anyone leave.

After plaintiffs asserted multiple objections to Szenay examining their animals, the parties agree that a second veterinarian, Heidi Jahnke, examined plaintiffs' donkey, and that after conferring with Szenay and David, the donkey was taken into the custody of Ashland County by David Hyde and Deputy Sheriff Provost.  David also told Patricia that based on the veterinarians' opinions, the donkey would need to be euthanized. Defendants assert that the veterinarians reached that conclusion based on Callae Hyde's instruction to euthanize the donkey if they determined that he was in imminent danger.

10

Plaintiffs claim that Patricia objected strenuously to the decision to euthanize Jethro and pleaded for David to allow her to call Jethro's primary veterinarian.  As she was going toward her house to call Jethro's veterinarian, plaintiffs assert that the veterinarians began preparing to euthanize Jethro.  While screaming, Patricia then ran back toward the barn in an attempt to stop the veterinarians from doing so.  What happened as Patricia approached the barn is again the subject of dispute between the parties.  According to plaintiffs, Deputy Sheriff Provost grabbed her, held her, and then threw her to the ground.  Defendants acknowledge that Provost physically held Patricia to prevent a dangerous situation, but they deny that she threw Patricia to the ground.  Instead, they contend, Provost insisted that Patricia calm down and released her hold on Patricia's arm once the veterinarians were finished euthanizing Jethro.

Ashland County also took custody of four of plaintiffs' horses that same day based on the opinions of the veterinarians, loading them onto trailers and transporting them to different facilities.[4]

## V. Events after Seizure

The parties agree that on December 27, Deputy Sheriff Provost informed Patricia that she would need to petition the courts to get her horses back.  According to plaintiffs, Callae and David Hyde returned to the property on January 16 to conduct a follow-up investigation.  Plaintiffs claim that Patricia repeatedly asked Callae and David about the condition of the four horses that were seized, but neither Callae nor David responded.

---

[4] For reasons that are unclear, defendants do a poor job of proposing facts describing the specific condition of plaintiffs' animals on December 26 and 27, choosing instead to put far more "facts" in their opening brief, but these cannot be considered on summary judgment.

11

Eventually, plaintiffs retained attorney Tyler Wickman to try to locate the horses in late January 2014.  Wickman sent Callae Hyde a letter on the Westmores' behalf to ask whether Patricia could visit her horses and what she must do to have them returned. In that letter, Wickman also requested all records concerning the seizure of plaintiffs' horses, while indicating that the Westmores were willing to file a petition for the return of their animals if Callae did not give a satisfactory response.  Callae Hyde responded by letter, assuring that the horses were being safely cared for, but also providing notice, apparently for the first time, that Ashland County was pursuing legal action against Patricia Westmore:

> Please be advised that I have received your request for open records.  At this time I would also like to advise you that Mrs. Westmore's case had been inadvertently closed and has been listed as active being it is still a pending case.   Ashland County is pursuing legal action against Mrs. Westmore at this time.   All records will be sent to your office.   Being an ongoing case you may want to request all amendments made to this case be sent to you.[5]

Wickman sent another letter to Callae in early February 2014, (1) asking for reports concerning the seizure of plaintiffs' animals, (2) renewing plaintiffs' request to visit or recover the animals, and (3) seeking information about David Hyde's qualifications as a humane officer under the Wisconsin statutes.   Plaintiffs claim that Callae did not respond to that letter.

In March 2014, plaintiffs retained new attorneys, John Carlson and Linda Coleman, to secure the return of their horses after Wickman was forced to withdraw

---

[5] Plaintiffs do not include a copy of this letter in the record, but since defendants only dispute plaintiffs' proposed fact purporting to quote the letter on the basis of relevance (Defs.' Resp. PFOF (dkt. #49) ¶ 107), the court will consider the content of the letter undisputed for summary judgment purposes.

from representing them due to a conflict of interest.  On March 7, plaintiffs' new attorneys filed a petition for the return of their animals, with a hearing date set for April 3, 2014.  Later that month, on March 12th and 21st, plaintiffs claim that Callae Hyde directed that an incident report dated more than a year before on December 27, 2013, be "supplemented" with new information from Callae and David Hyde, as well as the two veterinarians who examined the seized animals.  Defendants do not deny that the information contained in the original report was edited, but dispute that any revisions to the report resulted in new information being added.  Instead, defendants explain, the Ashland County district attorney simply asked Callae to have the report revised to make it more understandable to people unfamiliar with horses.

On March 26, 2014, the Ashland County District Attorney filed a five-count criminal complaint against Patricia Westmore for mistreating animals.  On March 28, 2014, plaintiffs' attorney Carlson emailed a letter to the Ashland County Circuit Court to request that the hearing "be taken off the calendar at this time" and stating that plaintiffs would request for the hearing to be rescheduled "[i]f there is a need to have a hearing on the petition in the future[.]"  (Defs.' Aff. Ex. M (dkt. #35-2).)

On July 16, 2014, Patricia entered into a "Deferred Entry of Judgment Agreement" with Ashland County.  Seven days later, three of the four horses seized were returned to plaintiff, the fourth having died while in the custody of Ashland County. The return of these three horses was memorialized in a "Stipulation for Order on Petition for the Return of Animals" approved by the Ashland County Circuit Court on August 12, 2014.

OPINION

13

Summary judgment is appropriate if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  "The party pursuing the motion must make an initial showing that the agreed-upon facts support a judgment in its favor.  *Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund*, 778 F.3d 593, 601 (7th Cir. 2015) (citing Fed. R. Civ. P. 56(a), (c)(1); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

If the moving party makes that initial showing on an issue for which the non-moving party will bear the burden of proof at trial, however, that party must "go beyond the pleadings" and "designate specific facts showing that there is a genuine issue for trial."  *Id.* at 324 (internal quotation marks omitted).  Moreover, the non-moving party must do more than "simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Rather, the non-moving party must produce "evidence . . . such that a reasonable jury could return a [favorable] verdict."  *Anderson*, 477 U.S. at 248.  A failure to make a sufficient showing of such evidence entitles the moving party to judgment as a matter of law.  *Celotex*, 477 U.S. at 323.

## I.  Fourth and Fourteenth Amendments

### A.  Warrantless Searches

The Fourth Amendment protects people in their "persons, houses, papers, and effects, against unreasonable searches and seizures," including from the warrantless entry of government officials into a person's home or curtilage of the home.  This protection does not apply, however, "to situations in which voluntary consent has been obtained,

either from the individual whose property is searched or from a third party who possesses common authority over the premises." *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990) (internal citations omitted).  Still, "[f]or a warrantless search premised on consent to be valid, the government must show that the consent was freely and voluntarily given -- a factual question to be determined by the totality of the circumstances." *McGann v. N.E. Ill. Regional Commuter R.R. Corp.*, 8 F.3d 1174, 1178 (7th Cir. 1993) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973)).  In addition, "a warrantless search of a shared dwelling for evidence over the express refusal of consent by a physically present resident cannot be justified as reasonable as to him on the basis of consent given to the police by another resident." *Georgia v. Randolph*, 547 U.S. 103, 120 (2006).

There is no dispute that David Hyde did *not* have a warrant both times he visited plaintiffs' property to examine the condition of her animals.  Nevertheless, defendants contend that neither David nor any of the individuals who went with him for the second visit needed a warrant, both because plaintiffs gave their voluntary consent to their search and because exigent circumstances provided an exception to the warrant requirement.  Specifically, defendants contend that aside from asking Gina Benson to leave their property on December 27, plaintiffs never stated expressly that: (1) they did not want David Hyde or any other individual on their property; or (2) defendants could not examine the animals.

In response to plaintiffs' assertion that Dwight Westmore asked David to leave on December 26, defendants point out that Dwight admitted uncertainty as to whether he

actually told David to leave his property at his deposition.[6]  Defendants further argue that Dwight's presence during David's search demonstrates his consent.  In contrast, plaintiffs stress that they never consented to David's search, and to the extent they arguably did, either implicitly or explicitly, their consent was only because David misrepresented that he was authorized to search as an Ashland County animal control officer.[7]

Although Dwight admitted at his deposition that he was not positive he told David to leave plaintiffs' property during his first search, the court must draw all reasonable inferences in plaintiffs' favor at summary judgment.  As such, defendants have not met *their* burden to establish that plaintiffs voluntarily consented to David's search on December 26.  *Cf. United States v. Etchin*, 614 F.3d 726, 733 (7th Cir. 2010) ("Where an occupant turns the police away or asks to see a warrant, the officer cannot, without

---

[6] Specifically, defendants cite to the following exchange from Dwight's deposition regarding David's first visit:

> Q: And then what did you folks first do after you went outside?
> A: I asked him if he had a warrant.
> Q: All right.  And what did he tell you?
> A: No.
> Q: All right.  Then what did you say?
> A: I told him to get out, I believe.
> Q: All right.  All right.  Well, do you believe you told him that or are you certain you told him that?
> A: I'm not real sure, but I know I was pretty mad.

(Dep. of Dwight Westmore (dkt. #26) at 17:22-18:7.)

[7] Plaintiffs argue that any consent they may have given for David to search their property was not given voluntarily.  Asserting that since David introduced himself as an "Animal Control Officer," yet had not submitted the required paperwork to be a humane officer under Wisconsin law, plaintiffs argue that any consent to search was obtained coercively.  Since, viewing the facts in the light most favorable to plaintiffs as the nonmoving party, plaintiffs did not consent to the search of their property, the court need not resolve whether any consent plaintiffs may have given was obtained by coercion.

some other suspicious activity, justify a warrantless entry based solely upon the fear that evidence might be destroyed.").

Of course, defendants also argue that David's initial, warrantless search was justified by exigent circumstances. The exigent circumstances exception to the general warrant requirement applies "when there is compelling need for official action and no time to secure a warrant." *Michigan v. Tyler*, 436 U.S. 499, 509, (1978); *see also Camara v. Mun. Court of City and Cty. of S.F.*, 387 U.S. 523, 539, 87 S. Ct. 1727 (1967) (recognizing even in the regulatory context, the importance of "prompt inspections, even without a warrant, that the law has traditionally upheld in regulatory situations"); *Siebert v. Severino*, 256 F.3d 648, 657 (7th Cir. 2001) ("Exigent circumstances may justify a warrantless seizure of animals.") (citing *DiCesare v. Stuart*, 12 F.3d 973, 977 (10th Cir. 1993)).

Defendants assert that at the time of David's first search, a veterinarian other than Szenay and Jahnke had called Callae Hyde to request that the county conduct a welfare check on plaintiffs' animals. (Defs.' Opening Br. (dkt. #18) at 13.) Gina Benson also called Ashland County to report her concerns. Callae had also spoken to Szenay about her own examination of plaintiffs' animals. (Defs.' PFOF (dkt. #34) ¶ 10.) Finally, defendants add that the circumstances were further exigent due to the dangerously cold temperatures. (Defs.' Opening Br. (dkt. #18) at 13.)

Several factors, however, cut against defendants' assertion that exigent circumstances justified a warrantless search during David's first visit. First, after Callae spoke with Sheriff Brennan on December 26, she told David to make arrangements for Szenay to meet him at plaintiffs' property the following morning. Second, Callae told

17

David to go to plaintiffs' property, *not* to conduct a search but for the purpose of informing them about the complaint.  Third, although David testified at his deposition that he had trouble getting in touch with veterinarians around the holiday season (Dep. of David Hyde (dkt. #27) at 47:1-3), Szenay told Callae that she would be willing to go to plaintiff's property *the following day*, on December 27.  Fourth, defendants point to no evidence in the record to suggest that David made any effort to arrange for a veterinarian to examine plaintiffs' animals on December 26, even though:  (1) he was first notified about the tip around 9:00 A.M. or 10:00 A.M. (*Id*. at 47:6-10); (2) he personally witnessed their condition that afternoon; and (3) Gina Benson volunteered to have trailers available to transport the animals on December 26 (*Id.* at 53:1-7).

This apparent lack of urgency with which defendants Callae and David Hyde arranged to have an Ashland County law enforcement official, veterinarians and equipment available to seize and transport or euthanize any of plaintiffs' animals after receiving Gina Benson's tip early on December 26 belies any inference that exigent circumstances existed to justify a warrantless search, especially since the time lapse also suggests that the Hydes had sufficient time to secure a search warrant before David first went to plaintiffs' property, much less before the second visit.  *See Siebert*, 256 F.3d at 657 ("[Defendant] could not have thought that the horses were faced with imminent harm because he left them at the [plaintiffs'] for three days after his initial search"); *DiCesare*, 12 F.3d at 978 ("No exigent circumstances supported this entry.  Although the horses were clearly in poor health, this did not excuse the officers from obtaining a warrant when they waited approximately sixteen hours after discovering the animals before seizing them.").

18

An objective standard governs the applicability of the exigent circumstances exception, making the question "whether it was reasonable for the police officers on the scene to believe, in light of the circumstances they faced, that there was a compelling need to act and no time to obtain a warrant." *Sutterfield v. City of Milwaukee*, 751 F.3d 542, 557 (7th Cir. 2014).   In determining whether reasonable officers had a "genuine need to forego the warrant process," courts "focus not only on the moment that [they] made the decision to make the warrantless entry, but rather 'appraise the agents' conduct during the entire period after they had a right to obtain a warrant and not merely from the moment when they knocked at the front door.'" *Id.* (quoting *United States v. Patino*, 830 F.3d 1413, 1416 (7th Cir. 1987)).

In short, defendants have fallen short of demonstrating that:   (1) plaintiffs voluntarily consented to either search; or (2) exigent circumstances existed for David's initial warrantless search on December 26.   At least as to David, and to a lesser extent Provost, who knew David acted without a warrant, this latter ruling makes problematic any evaluation of the claimed exigent circumstances the following day as well, since it is premised in substantial part on David's personal observations on December 26 as to the conditions of plaintiffs' donkey and several horses.   Regardless, there are enough disputed facts regarding the timing of the execution of the second search to call into question whether exigent circumstances existed.   Therefore, the court will deny summary judgment to defendants on plaintiffs' Fourth Amendment claim for both days.

Finally, defendants argue in their opening brief in support of the motion for summary judgment that the individual defendants are entitled to qualified immunity, but then only cite the facts of one case in which the Seventh Circuit held that probable cause

19

existed for the seizure of animals.  In light of the questions surrounding what Provost and David should have known about the requirement to obtain a warrant before searching plaintiffs' property, and the time available to obtain a warrant, those defendants may well have violated clearly established constitutional rights and, depending on the jury's findings, are not entitled to qualified immunity.  As for Callae Hyde and Sheriff Michael Brennan on the other hand, they appear to have violated no clearly established right of the plaintiffs and will be dismissed on grounds of qualified immunity for their roles in this lawsuit.

### B. Warrantless Seizures

Defendants also move for summary judgment on plaintiffs' claim that the warrantless seizure of their animals on December 27 violated the Fourth Amendment. That morning, David spoke to Deputy Sheriff Provost over the phone and met with her before going to the Westmores' property.  When Deputy Provost asked David whether he had a warrant to take plaintiffs' animals, he answered "no," but then explained that several horses were in imminent danger because they were malnourished and cold weather was approaching.  David also informed the Deputy that plaintiffs' donkey may need to be put down.

Although plaintiffs assert that they did not voluntarily consent to David, Provost and the others being on their property on December 27, Deputy Provost was authorized to take custody of their animals if she had "reasonable grounds" to believe they were being treated in a cruel manner in violation of chapter 951 of the Wisconsin statutes. Wis. Stat. § 173.13(1).  Similarly, the Wisconsin statutes permit an animal in custody to

be euthanized if there are reasonable grounds to believe it is "hopelessly injured beyond any reasonable chance of recovery." Wis. Stat. § 173.23(4)(a). This reasonable grounds standard mirrors that of "probable cause" under the Fourth Amendment. *Mahnke v. Garrigan*, 428 F. App'x 630, 633 (7th Cir. 2011) (citing *Johnson v. State*, 75 Wis. 2d 344, 249 N.W.2d 593, 595-96 (1977)). Probable cause exists if the facts and circumstances available would justify a reasonable belief that a crime has been committed, based on the elements of the applicable statute. *Mahnke*, 428 F. App'x at 634 (citing *Stokes v. Bd. of Educ.*, 599 F.3d 617, 622 (7th Cir. 2010); *Siebert*, 256 F.3d at 654). Among other things, chapter 951 prohibits the cruel treatment of animals and requires the provision of appropriate food and drink, as well as shelter.[8] Wis. Stat. § 951.02 ("No person may treat any animal . . . in a cruel manner."); Wis. Stat. § 951.13 (a supply of food "shall be sufficient to maintain all animals in good health."); Wis. Stat. § 951.14 ("Natural or artificial shelter appropriate to the local climatic conditions for the species concerned shall be provided as necessary for the health of the animal.").

Although plaintiffs generally dispute or attempt to explain away defendants' account of the poor health and living conditions of plaintiffs' animals,[9] two veterinarians recommended to David and Provost on December 27 that plaintiffs' donkey should be

---

[8] "'Cruel' means causing unnecessary and excessive pain or suffering or unjustifiable injury or death." Wis. Stat. § 951.01.

[9] For example, Jahnke's report of her observations on December 27 states that plaintiffs' donkey had been recumbent for seven days and that its mucous membranes were bright red and tacky, signaling toxic shock. (Aff. of Heidi Jahnke Ex. E (dkt. #20-2) ECF 3.) Her report also details her concern that plaintiffs' horses lacked adequate sources of food, water and shelter. (*Id.*; *see also* Aff. of Lesley Szenay Ex. C (dkt. #19-3) ECF 4.) Plaintiffs, in contrast, (1) stress that they were monitoring the health of their donkey, (2) explain that their horses had grown thick hair and had access to natural windbreaks to deal with the cold weather, and (3) dispute that their animals did not have adequate food or drink. (*See* Pls.' PFOF (dkt. #38) 59-63.)

euthanized based on his lasting ailments and four of their horses taken into the county's custody because of their condition.   Plaintiffs also offer little to contradict David's observations of their donkey on December 26, other than arguing that he could not have reasonably believed that they were mistreating it after informing him that a veterinarian was providing ongoing treatment.[10]

Similarly, plaintiffs principally dispute the veterinarians' conclusions by attacking their credibility, arguing that their reports lack reliability because they were not formally prepared until months after December 27.   Thus, while plaintiffs challenge the veterinarians' observations about the adequacy of their animals' food, water and shelter, they do little to contradict the veterinarians' overall opinions that euthanasia was appropriate for plaintiffs' donkey and that four horses were in imminent danger. Regardless, Deputy Sheriff Provost was entitled to rely on these opinions to seize plaintiffs' animals.   *See, e.g., Sow v. Fortville Police Dep't*, 636 F.3d 293, 302 (7th Cir. 2011) ("When an officer receives information from a third party whom it seems reasonable to believe is telling the truth, the officer has probable cause to effectuate an arrest.").   Since the record demonstrates that Provost authorized the euthanasia of plaintiffs' donkey and seizure of their horses only after two veterinarians recommended those outcomes, plaintiffs cannot hold defendants liable for the seizures on an independent basis.   If the jury finds that no one should have been on the property

---

[10] Plaintiffs hinge that argument on Wis. Stat. § 951.02, which states that the prohibition against treating animals cruelly "does not prohibit normal and accepted veterinary practices."   The exception set forth in § 951.02, however, is inapposite because defendants were being advised by independent *veterinarians* that the donkey should be put down in keeping with veterinary practices.   Moreover, while David could not have ignored plaintiffs' explanations of the apparent shortcomings regarding the care of their animals, neither was he required to credit them.   *See Mahnke*, 428 F. App'x at 635.

without a warrant, however, then defendants Provost and David *may* still be held liable for the seizure of the animals.[11]

## C. Excessive Force

Defendants also move for summary judgment on plaintiff Patricia Westmore's claim that Deputy Sheriff Provost used excessive force on her in violation of the Fourth Amendment.[12]  Claims that a government official used excessive force in seizing a person in violation of the Fourth Amendment are analyzed under an "objective reasonableness" standard.  *Graham v. Connor*, 490 U.S. 386, 388 (1989).  Courts must balance the interests of the government against the Fourth Amendment interests of the individual in determining the reasonableness of a particular seizure.  *See id.* at 396 (internal quotation marks omitted).  "An officer's use of force is unreasonable if, judging from the totality of the circumstances at the time of the [seizure], the officer uses greater force than necessary to effectuate the [seizure]."  *Phillips v. Cmty. Ins. Corp.*, 678 F.3d 513, 519 (7th Cir. 2012).  Since the inquiry into the totality of the circumstances surrounding the reasonableness of a particular seizure is objective, the motives and intent of the officer are not considered, and the "tense, uncertain and rapidly evolving" nature of the circumstances must be taken into account.  *Graham*, 490 U.S. at 397.  When the facts surrounding a Fourth Amendment seizure are not in dispute, whether the force used was reasonable is a legal question rather than a question of fact for the jury.  *Phillips*, 678 F.3d at 519 (citing *Bell v. Irwin*, 321 F.3d 637, 640 (7th Cir. 2003)).

---

[11] Since this was not briefed by the parties, the court reserves on this question of causation.

[12] Westmore voluntarily dismissed her state law battery claim against Provost.  (Pl.'s Resp. Br. (dkt. #32) at 38.)

The facts here show Patricia "ran screaming" towards the veterinarians who were euthanizing her donkey in the barn. (Defs.' Reply PFOF (dkt. #50) ¶ 27.) While Patricia's reaction was understandable, so, too, was Deputy Provost's decision to prevent her from interfering in what Provost reasonably understood to be a lawful act. Moreover, it is undisputed that as soon as the veterinarians had finished the euthanasia, Provost allowed Patricia "to walk free." (*Id.* at ¶ 32.) If this was Patricia's entire claim, there would be no basis for Patricia to proceed. The facts between those two events, however, are in dispute.

Plaintiff claims that Provost "physically restrained her, placed her in a hold, and then threw her to the ground." (Pls.' PFOF (dkt. #38) ¶ 88.) Defendants, on the other hand, contend that Provost merely outstretched her arms at the entrance of the barn to block Patricia from entering, then, when necessary, "grabbed a hold of [Patricia] and told her she needed to calm down." (Defs.' PFOF (dkt. #34) ¶ 30.)

The disputes of fact regarding whether Provost threw Patricia to the ground, and if so, why, are material to whether Provost used excessive force in seizing Patricia.[13] In

---

[13] Plaintiff cites her own affidavit in support of her proposed fact that Deputy Provost threw her to the ground, which asserts that much but no further. (Pl.'s PFOF (dkt. #38) ¶ 88.) In response to plaintiff's proposed finding of fact, defendants point out that Patricia could not recall Provost throwing her to the ground at her second deposition taken in this case, which was taken before the date she signed her affidavit. (Defs.' Resp. PFOF (dkt. #49) ¶ 88 (citing Dep. of Patricia Westmore (dkt. #32) at 12:24-25, 13:14-15).) Defendants do not move to strike any facts contained in Patricia's affidavit under the sham affidavit rule. *See Bank of Ill. v. Allied Signal Safety Restraint Sys.*, 75 F.3d 1162, 1168-69 (7th Cir. 1996). Perhaps this is because the Seventh Circuit has cautioned restraint in applying the sham affidavit rule, particularly when the witness testifies at an earlier deposition that he or she cannot remember a particular fact. *See id.* at 1169; *EEOC v. Aurora Health Care, Inc.*, 12-cv-984-JPS, 2015 WL 2344727, at *5 n.28 (E.D. Wis. May 14, 2015) ("[The witness's] general lack of memory at a specific time is not specifically contradicted by her later memory. Indeed, that is often the nature of memory."). Even though her deposition testimony would not provide a reason to strike her affidavit, it is likely that Patricia will have to overcome a serious credibility challenge at trial in light of her memory difficulties and her deposition testimony that she was rotating her body to break loose from

24

light of the facts in the summary judgment record, Provost certainly had objectively reasonable grounds to seize Patricia to prevent her from entering the barn where the veterinarians were preparing needles to euthanize her donkey, physically if necessary. But construing the facts in the light most favorable to Patricia as the non-moving party, a reasonable jury could find that Provost used excessive force if it finds that she threw Patricia to the ground, particularly given her age. *See Meredith v. Erath*, 342 F.3d 1057, 1061 (9th Cir. 2003) (holding that a reasonable jury could find that officer who grabbed her arms, threw her to the ground and twisted her arms violated her Fourth Amendment rights in light of the minimal need for force.).  Accordingly, the court cannot enter summary judgment in defendants' favor on plaintiff's excessive force claim.

## II. Fifth and Fourteenth Amendments

Next, defendants move for summary judgment on plaintiffs' due process claim. Plaintiffs argue that they were not afforded sufficient procedural due process rights when defendants seized their animals without a pre-deprivation hearing, further claiming that the post-deprivation due process to which they were afforded was inadequate to satisfy their due process rights.

The two-step analysis for a procedural due process claim requires the court to consider (1) "whether the plaintiff[s] [were] deprived of a constitutionally protected interest in life, liberty or property," and if so, (2) "what process [they were] due with respect to that deprivation." *Porter v. DiBlasio*, 93 F.3d 301, 305 (7th Cir. 1996).

---

Deputy Provost's grasp.  (Dep. of Patricia Westmore (dkt. #32) at 13:24-14:3.)

Plaintiffs easily satisfy the first prong, since the Fourteenth Amendment protects their property interest in the animals.  (*Id.*)

With respect to the second prong, the state must generally provide a pre-deprivation hearing before taking property when feasible, regardless whether post-deprivation remedies are adequate to compensate for the taking, *Zinermon v. Burch*, 494 U.S. 113, 132 (1990), or whether the deprivation of property is only temporary, *Penn Central Corp. v. U.S. Railroad Vest Corp.*, 955 F.2d 1158, 1162 (7th Cir. 1992).  This general rule requiring a pre-deprivation hearing falls away, however, when such a hearing would be "unduly burdensome in proportion to the liberty interest at stake."  *Zinermon*, 494 U.S. at 132.  Moreover, the value of a pre-deprivation hearing is low when there are safeguards against the risk of the state taking property in error.  *See Memphis Light, Gas and Water Div. v. Craft*, 436 U.S. 1, 19 (1978).

Here, given that Wisconsin requires probable cause before law enforcement officials are permitted to take custody of an animal and that Provost acted upon the recommendations of two veterinarians, plaintiffs were not entitled to a pre-deprivation hearing.  *See Mahnke*, 428 F. App'x at 636 (A seizure arising from a criminal investigation does not threaten due process where, as here, the state requires a fair and reliable determination of probable cause as a condition to the seizure."); *see also Reams v. Irvin*, 561 F.3d 1258, 1264 (11th Cir. 2009) ("Insofar as the decision to impound Reams' equines was based upon an examination of the equines and an assessment of their condition by a veterinarian, we find that an evidentiary hearing prior to impoundment was of limited potential value and thus agree with the district court that a post-deprivation, versus a pre-deprivation, hearing was unlikely to spawn significant

factual errors.") (internal quotation marks omitted); *cf. Siebert*, 256 F.3d at 660 (some pre-deprivation opportunity to be heard, perhaps even the state's volunteer investigator meeting with plaintiff before removing her horses, was required when the investigator waited 72 hours before seizing the horses).

Plaintiffs also fail to demonstrate that the post-deprivation remedies provided by Wis. Stat. § 173.22 are inadequate.  Contrary to plaintiffs' assertion, § 173.22 provides for an owner of an animal taken into custody to petition the appropriate Wisconsin circuit court to challenge the animal's seizure and sets forth what the court should consider after holding a hearing on the owner's petition.  In addition, plaintiffs were given the opportunity to contest the seizure of their animals at a post-deprivation hearing but chose not to pursue it.  Plaintiffs attempt to explain away the letter their attorney sent asking the state circuit court to cancel the hearing on plaintiffs' petition for the return of their animals by claiming that the hearing was cancelled "[b]ecause of the filing of the criminal matter against Patricia Westmore," but they offer no further explanation in support of this vague, unsupported assertion.  (Pls.' Resp. PFOF (dkt. #37) ¶ 26; Pls.' PFOF (dkt. #38) ¶ 116 (citing Aff. of Patricia Westmore (dkt. #39) ¶ 48 (stating only that certain paragraphs of plaintiffs' amended complaint are "true and correct statements of fact and are restated and set forth in our Proposed Findings of Fact").)  Since plaintiffs cannot show that the post-deprivation remedies to which they were entitled were inadequate, defendants are entitled to summary judgment on plaintiffs' due process claim.[14]

---

[14] Plaintiffs also fail to demonstrate that Wisconsin tort remedies are inadequate to satisfy due

## III.    First and Fourteenth Amendments

Patricia also claims that she was retaliated against in violation of the First Amendment when Callae Hyde induced the Ashland County District Attorney to pursue criminal charges against her.  "If an individual is subjected to criminal prosecution in retaliation for constitutionally protected speech and nonretaliatory grounds are in fact insufficient to provoke the adverse consequences, then instigation of the retaliatory prosecution is subject to recovery as the but-for cause for official action offending the Constitution."  *Peals v. Terre Haute Police Dep't*, 535 F.3d 621, 626 (7th Cir. 2008) (internal quotation marks and citation omitted).  To succeed on her claim, therefore, Patricia must at minimum prove that Callae acted in retaliation for protected activity *and* induced the prosecutor to bring charges that otherwise would not have been brought absent her urging. *See Hartman v. Moore*, 547 U.S. 250, 262 (2006).  To show a causal connection between an official's retaliatory animus and injury from a retaliatory action, Patricia must also prove that there was no probable cause to support the underlying charge.  *Peals*, 535 F.3d at 626 (citing *Hartman*, 547 U.S. at 265-66) (explaining that "a retaliatory motive on the part of an official urging prosecution combined with an absence of probable cause supporting the prosecutor's decision to go forward are reasonable grounds to suspend the presumption of regularity behind the charging decision").

---

process.  *See Enright v. Bd. of Sch. Dirs. of City of Milwaukee*, 118 Wis. 2d 236, 255, 346 N.W.2d 771 (1984) (state-provided tort remedy to redress the deprivation of constitutional rights can meet procedural due process requirements).  Here, it would appear that the availability of tort remedies would foreclose a due process claim, since Wisconsin law provides post-deprivation procedures for challenging the alleged wrongful taking of property.  *See, e.g.,* Wis. Stat. ch. 893 (containing provisions concerning tort actions to recover damages for wrongfully taken or detained personal property).

Patricia would have the trier of fact infer retaliatory animus to Callae by virtue of her hiring attorneys to request information about her seized horses and petition for their return, which put her "in the process of exposing defendants' illegal and unconstitutional acts." (Pls.' Resp. Br. (dkt. #36) at 34.)  There is no dispute that Callae induced the district attorney to pursue criminal charges against Patricia, and construing the facts in the light most favorable to plaintiffs, a reasonable jury could infer retaliatory animus from the timing of Callae's efforts to support criminal charges against Patricia.  Plaintiff provides little to support her assertion, however, that Callae "falsely manufactured" probable cause.  Probable cause means "only a probability or substantial chance of criminal activity, not a certainty that a crime was committed." *Beauchamp v. City of Noblesville, Ind.*, 320 F.3d 733, 743 (7th Cir. 2003) (citing *Illinois v. Gates*, 462 U.S. 213, 244 n.13 (1983)).  The analysis of whether probable cause existed depends on the facts as they existed at the time the official made the alleged retaliatory decision, not how they unfolded in hindsight.  *See id.* (discussing probable cause analysis in context of retaliatory arrest).

Because the opinions offered by the veterinarians as to the causes of the condition of their donkey and some of their horses were sufficient to establish probable cause, no genuine dispute of material fact on plaintiffs' retaliatory inducement to prosecute claim remains.  *See Mahnke*, 428 F. App'x at 635 (finding probable cause that horses were being kept in violation of Section 951 based on information the officer received from third parties and the appearance of the horses).  Accordingly, summary judgment will be granted to defendants on this claim as well.

IV.   *Monell* Claim

Finally, defendants move for summary judgment on plaintiffs' claim seeking to hold Ashland County and Sheriff Brennan liable for the violation of plaintiffs' constitutional rights due to the inadequate training and supervision of the other named defendants.   A municipality may be held liable for the violation of a plaintiff's constitutional rights under 42 U.S.C. § 1983 when that violation results from a policy, custom or practice adopted or authorized by the municipality.   *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690-92 (1978).   Put differently, a municipality can be held liable for the violation of an individual's civil rights if that violation results from an express policy that causes a constitutional deprivation when enforced or from "a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law."   *McTigue v. City of Chi.*, 60 F.3d 381, 382 (7th Cir. 1995) (internal quotation marks and citation omitted).   In addition, plaintiff can hold the county or its responsible policymaker, in his official capacity, liable where its "failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants . . . such [that] a shortcoming [can] be properly thought of as a . . . 'policy or custom' that is actionable under § 1983."   *City of Canton, Ohio v. Harris*, 489 U.S. 378, 389 (1989).

Defendants argue in their opening brief that plaintiffs cannot show that there was any practice that would constitute such a custom or usage, and Ashland County cannot be responsible for any inadequate policy of training Callae or David Hyde because they were not "solely trained" as humane officers by Ashland County.   (Defs.' Opening Br. (dkt. #18) at 30.)   Again, inexplicably, defendants do not address plaintiffs' arguments in

response to defendants' motion for summary judgment in their reply brief, but in fairness, plaintiffs do a poor job not only of describing the basis of their *Monell* claims, but of citing case law under facts similar to this case in which courts have found *Monell* liability.

Plaintiffs first claim that "Brennan's (and the County's) liability in this case depends 'upon whether he failed to train his officers in the proper execution of an [animal welfare search and seizure] and whether this failure permitted or encouraged his officers' unconstitutional conduct' towards plaintiffs on December 26 & 27, 2013, and thereafter in retaliating against them[.]"  (Pl.'s Opp'n Br. (dkt. #36) at 41 (alterations in original) (quoting *Bruce v. Beary*, 498 F.3d 1232, 1249 (11th Cir. 2007).)   Plaintiffs further explain that "[a]s the final decision-maker in the Ashland County Sheriff's Department, Brennan 'had the responsibility to see that' plaintiffs' four horses were returned after they were illegally seized by defendants."  (*Id.* (quoting *Bruce*, 498 F.3d at 1249).)

In summarizing the basis for *Monell* liability, plaintiffs simply assert that:

> Brennan (1) personally authorized the unconstitutional actions taken by Callae Hyde, David Hyde and Provost on December 26 & 27, 2013; (2) was aware of Callae Hyde's retaliatory inducement of prosecution of Patricia Westmore after she had hired Attorney Wickman to help recover plaintiffs' horses; (3) failed to properly supervise and train Callae Hyde, David Hyde, and Provost regarding the execution of animal welfare searches and seizures and related requirements under the Fourth Amendment; (4) did not keep records of his own relating to this case; and (5) had not even read Wis. Stat. Ch. 173 [concerning animals and humane officers], before he was deposed on July 29, 2015.

*Id.* at 41-42.)  Plaintiffs then cite to various paragraphs of their proposed findings of fact to demonstrate where those "facts" supporting *Monell* liability appear in the record, before stating in conclusory fashion that "based on the applicable law and the facts set forth above, defendants' argument that the County is not liable to plaintiffs under 42 U.S.C. § 1983 should be rejected by the Court, because the deprivation of plaintiffs' federal rights was caused, in part, by the County's own policy, custom or practice, including its inadequate training and supervision of the individual defendants, who were under Brennan's supervision and control at all relevant times."  (*Id.* at 42-45.)

Plaintiffs fall far short of demonstrating that Ashland County can be held liable under *Monell* for the allegedly inadequate training or supervision of Callae and David Hyde or Deputy Provost.  Plaintiffs cannot show that deliberate indifference on the part of Ashland County or Sheriff Brennan by pointing to a David Hyde's search on December 26 as a single instance of allegedly unconstitutional conduct.  *See Estate of Novack ex rel. Turbin v. Cty. of Wood*, 226 F.3d 525, 531 (7th Cir. 2000).  Nor can plaintiffs point to any single decision by an Ashland County policymaker that would support *Monell* liability.  *See Pembaur v. City of Cinicnnati*, 475 U.S. 469, 480 (1986).  Moreover, plaintiffs have made no showing that the need for Ashland County to provide training for circumstances related to the events of this case was so obvious to be deliberately indifferent to a likely violation of constitutional rights.  *See Harris*, 489 U.S. at 389-91.

Indeed, Callae testified at her deposition that she takes continuing education courses related to her humane officer duties, including training regarding search warrants.  (Dep. of Callae Hyde (dkt. #29) at 22:3-21.)  Similarly, David took the state Humane

Officer training course in September 2011.   (Aff. of David Hyde (dkt. #27) ¶ 2.) Plaintiffs do not demonstrate why this training was inadequate under *Monell*.  The failure of plaintiffs to show why Ashland County and Sheriff Brennan should have recognized the training received by any defendant to be so obviously inadequate precludes a reasonable jury from finding that any deficiency in training caused a violation of plaintiffs' constitutional rights.  *See Harris*, 489 U.S. at 391 (requiring plaintiff to prove causation, since attaching *Monell* liability in that case required a showing that "the identified deficiency in [the] city's training program . . . [was] closely related to the ultimate injury").  Defendants are, therefore, entitled to summary judgment on plaintiffs' *Monell* claim.

ORDER

IT IS ORDERED that:

1) Defendants' motion for summary judgment (dkt. #17) is GRANTED IN PART and DENIED IN PART, consistent with this opinion;

2)  Plaintiffs' motion to strike (dkt. #53) is DENIED;

3) Plaintiffs' claims against defendants Callae Hyde, Michael Brennan and Ashland County are DISMISSED, and the clerk of court is directed to terminate those defendants.

Entered this 5th day of May, 2016.

BY THE COURT:

/s/

WILLIAM M. CONLEY
District Judge